## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**TIMOTHY J. SMALL,**
**Plaintiff,**

**v.**                                        **Case No: 3:08cv44/MCR/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
**Defendant.**

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Small's application for disability insurance benefits under Title II of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## PROCEDURAL HISTORY

Plaintiff, Timothy Small, filed an application for benefits which was denied initially and on reconsideration.  He requested a hearing before an Administrative Law Judge (ALJ), and a hearing was held on November 17, 2005 and a supplemental hearing was held on September 11, 2007.  Mr. Small was represented by counsel and testified at both hearings, as did a vocational expert.  Mr. Small's wife testified at the supplemental hearing.  The ALJ entered an unfavorable decision on September 25, 2007 (tr. 15-45) and the Appeals Counsel declined review (tr. 6-8), making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court.  *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This timely appeal followed.


## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that Mr. Small last met the insured status requirements of the Act on December 31, 2006, meaning that in order to prove eligibility for disability insurance benefits, he had to prove he was disabled no later than that date (the date last insured); that he had severe impairments of (1) major depressive disorder secondary to organic affective disorder, (2) mood disorder, (3) reading disorder, (4) disorder of written expression, (5) loss of 20% extension of the right elbow, and (6) status post left hand well-healed fracture with residual reflex sympathetic dystrophy of the left upper extremity; that although he had other injuries secondary to an industrial accident, none of those injuries posed significant work-related limitations for a period of twelve months; that his severe impairments did not meet or equal one of the impairments listed in 20 C.F.R. part 404, Subpart P, Appendix 1; that he had the residual physical and mental functional capacity to perform the duties of unskilled sedentary work; that his

description of his limitations lacked credibility; and that as of his date last insured he was not disabled as defined in the Act.

## STANDARD OF REVIEW

In Social Security appeals, this court must review de novo the legal principles upon which the Commissioner's decision is based.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (citing *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  There is no presumption that the Commissioner followed the appropriate legal standards in deciding a claim for benefits, or that the legal conclusions reached were valid.  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  Failure to either apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.  *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007).

The court must also determine whether the ALJ's decision is supported by substantial evidence.  *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004)).  Even if the proof preponderates against the Commissioner's decision, if supported by substantial evidence, it must be affirmed.  *Ingram*, 496 F.3d at 1260; *Miles*, 84 F.3d at 1400.  Substantial evidence is more than a scintilla but less than a preponderance, and it encompasses such relevant evidence as a reasonable person would accept as adequate to support a conclusion.  *Moore*, 405 F.3d at 1211 (citation omitted).  In determining whether substantial evidence exists, the court  must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence.  *Moore*, 405. F.3d at 1211 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  Findings of

fact of the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Ingram*, 496 F.3d at 1260.

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The social security regulations establish a five-step evaluation process to analyze claims for both SSI and disability insurance benefits.  *See Moore,* 405 F.3d at 1211;  20 C.F.R. § 416.912 (2005) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2005) (five-step determination for DIB).  A finding of disability or no disability at any step renders further evaluation unnecessary.  The steps are:

1.    Is the individual currently engaged in substantial gainful activity?

2.    Does the individual have any severe impairment?

3.    Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.    Does the individual have any impairments which prevent past relevant work?

5.    Do the individual's impairments prevent any other work?

These regulations place a very heavy burden on the claimant to demonstrate both a qualifying impairment or disability and an inability to perform past relevant work. *Moore*, 405 F.3d at 1211 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir.1985)).  If the claimant establishes such an impairment, the burden shifts to the

Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir. 1987).  If the Commissioner carries this burden, claimant must prove that he cannot perform the work suggested by the Commissioner. *Doughty,* 245 F.3d at 1278 n.2; *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

On April 2, 2002 Mr. Small was injured in an industrial accident when he fell approximately thirty feet from a scaffold and broke several facial bones, his left wrist in several places, and his right elbow.  He also sustained a closed head injury.  He was hospitalized from April 2 through April 13, 2002 (tr. 385-411).

Physical injuries.

Douglas Tappan, M.D., an orthopedic surgeon,  reduced the fractures in Mr. Small's left arm by open reduction, did a left carpal tunnel release, and repositioned the dislocated right elbow (tr.277-84).  Dr. Tappan noted that Mr. Small continued to suffer pain into August 2002, although he had made some progress in his recovery (tr. 279).  His wrist motion was about 2/3 of normal in both flexion and extension. The right elbow also came within a few degrees of full extension.  On October 28, 2002, Dr. Tappen rated Mr. Small at maximum medical improvement (MMI) with a 6% total body impairment for injuries to both upper extremities (tr. 277).  On April 8, 2003, Dr. Tappen noted that Mr. Small was evidently suffering some type of persistent nerve problem for which he had been seeing Ian Rogers, M.D., a plastic surgeon.  Mr. Small indicated that Dr. Rogers planned on doing surgery on his hand and that electrical studies had been performed.

Dr. Rogers treated Mr. Small for his hand and wrist problems from June 25, 2002 through September 18, 2003 (tr. 256-261).  Mr. Small's complaints included loss

of motion, anterior shoulder pain, hand shaking badly with use, and an inability to fully extend his right elbow (tr. 260).  Examination of the right elbow demonstrated a good range of motion but lacking full extension of 30 degrees.  The distal radial fracture was healing but there was post-traumatic stiffness and possible neurogenic pain related either to nerve damage at the fracture site or in the lower brachial plexus (tr. 261).  In January of 2003, Dr. Rogers noted that Mr. Small was no longer complaining of shooting pain around his left hand associated with loss of motion and he no longer had anterior shoulder pain (tr. 258). A nerve conduction study demonstrated median neuropathy at the wrist.  It was felt that this could represent continuing compression or be a result of nerve injury sustained at the time of the fracture.  Dr. Rogers noted that the only way to know whether or not it was a curable problem would be to re-explore the injury site via surgery (*id*.).

Because of continuing neurological signs, Dr. Rogers performed a radial neurolysis of the median nerve with debridement of fibrosis and synovitis on April 14, 2003 (tr. 257).  In May 2003 improvement was noted but discomfort and aching continued in the wrist and MP joint area.  On June 12, 2003 Dr. Rogers released Mr. Small to light duty (tr. 257).  On September 2003, Mr. Small continued to complain of numbness in the third and fourth fingers and painful loss of motion in his wrist, and there was reduced sensation in the third and median half of the fourth finger.  Dr. Rogers felt that Mr. Small had reach MMI with an impairment rating of 21% of the upper extremity or 13% of the whole person. He reiterated that Mr. Small may require an arthodesis in the future and gave permanent restrictions of avoiding repetitive motion or lifting in excess of 20 pounds (tr. 256).

On January 15, 2004 Mr. Small began seeing Scott Haufe, M.D. and Chris Kunis, M.D. at the Microspine Surgery Center (tr. 373).  He complained of a deep throbbing ache and stiffness in his left arm.  Pain seemed to be in the original region where his carpal tunnel radiated into his three smaller fingers with sensitivity around

the carpal tunnel region and scar tissue build-up.   Dr. Haufe stated that the symptoms appeared to be consistent with a reflex sympathetic dystrophy (RSD) injury with residual carpal tunnel, probably from scar tissue sitting around the nerve root (tr. 373).  Mr. Small reported that physical therapy made the pain worse and that epidural injections gave little benefit (tr. 373).  He reported burning down the third, fourth and fifth fingers which radiated up the arm once the wrist began to hurt significantly (tr. 374).  Dr. Haufe recommended stellate ganglion blocks on the left and injection of cortisone into the scar region around the median nerve (tr. 373).  He prescribed Elavil 50 milligrams to take at bedtime and Clonidine patches to put on the affected region of the wrist.

Mr. Small continued to treat at the Microspine Surgery Center under the care of Drs. Haufe and Kunis through the date of the final supplemental hearing (tr. 348-376, 501-513, 573- 603).  Therapeutic blocks were performed and different medications were prescribed including Methadone and Lortab.  However, the pain persisted in the left upper extremity.  Mr. Small reported increasing pain in the left arm and increased pain levels in the left upper chest and shoulder area.  As of mid-2007, Mr. Small continued to complain of pain and difficulty sleeping.  On his last visit with Dr. Kunis his medications included Ambien, Methadone and Lortab (tr. 575).

On August 11, 2006, Dr. Kunis completed a Clinical Assessment of Pain form in which he indicated that Mr. Small's pain was intractable and virtually incapacitating to him, and that physical activity such as walking, standing, bending, and moving of extremities would increase his pain to such an extent that bed rest and/or medication would be necessary.  He also opined that drug side effects would be expected to be severe and could limit the effectiveness due to distraction, inattention and drowsiness. He felt that Mr. Small had an underlying medical

condition that was reasonably expected to produce the pain described and that this level of severity of his pain had existed since April of 2002 (tr. 546-47).

On May 17, 2002, approximately six weeks post-accident, Mr. Small was seen by Bayard D. Miller, M.D., a neurologist, for treatment associated with his head injury.  Mr. Small reported headaches which were gradually resolving, but he was concerned with his memory and his concept of time. He stated that he would mis-remember events, that his concept of time was somewhat disoriented and that he was forgetting recent events.  He also stated that his balance was not right and that he would often tend to lean or drift to the left.  Dr. Miller's assessment was status post concussion with short-term memory problems and balance problems which were consistent with the type of injury he had suffered.  Because Mr. Small had been unconscious for a relatively short period of time, Dr. Miller anticipated he would not have major permanent residuals and that he should continue to improve (tr. 428-430).

In September 2002, Mr. Small returned to Dr. Miller reporting different kinds of "spells," including dizziness and lightheadedness with dimming vision and loss of balance.  He also described episodes of having a bad taste in his mouth and some trembling.  Because there was a significant possibility that some of the spells were partial seizures, Dr. Miller began an anti-convulsant medication.  If there were no improvement, Dr. Miller recommended EMU evaluation to better define the underlying situation.  Mr. Small returned for follow-up on October 4, 2002.  There had been no blackouts, but he described some spells once or twice a day (tr. 419-430).

EMU testing was performed by George Pelaez, M.D. a neurologist, on December 9, 2002.  Plaintiff reported two seizures during the test, but the EEG was normal and no EEG abnormalities were associated with the events (tr. 438).  On March 24, 2003 Mr. Small again returned to Dr. Miller, who thought he was doing fairly well but was continuing to have problems with interim headaches and

dizziness. He also continued to have spells where he felt off balance. He was sleeping fairly well but his wife indicated that he jumped and jerked during his sleep. Dr. Miller prescribed Naprosyn as needed for his headaches and planned to recheck him in four months or on an as-needed basis (tr. 241-242).

<u>Psychological injuries.</u>

In addition to his physical injuries, Mr. Small was examined and treated for psychological problems. In May and June, 2002, Mr. Small saw Brett Turner, Psy.D. for a neuropsychological evaluation. The resulting diagnoses included: (1) cognitive disorder - not otherwise specified (NOS), (2) mood disorder due to head trauma, (3) post traumatic stress disorder (provisional), (4) learning disorder - NOS and (5) closed head injury. Dr. Turner concluded that Mr. Small had moderately severe psycho-social stressors and borderline deficits in focused and sustained concentration with mild susceptibility to interference and distraction. He noted a significant loss of visual information and poor recall after a brief delay. Dr. Turner also felt that Mr. Small was experiencing a significant amount of depression, anxiety and emotional distress, consistent with traumatic head injury. He recommended referral for psychopharmacological evaluation of Mr. Small's symptoms of depression and anxiety, follow up with a neurologist for treatment of headaches and cognitive dysfunction and evaluation of seizures, occupational therapy to improve fine motor skills, psycho-education and psychotherapy (tr. 206-18).

On August 6, 2002, Mr. Small was evaluated by Douglas Fraser, M.D., a psychiatrist (tr. 219). Dr. Fraser opined that Mr. Small was suffering from moderate major depression and a possible cognitive disorder. He prescribed Effexor for the symptoms of depression and Ambien for sleep difficulties, and recommended neuropsychological retesting in 4 to 5 months, psychotherapy and follow up in 3 weeks (tr. 222-23). Dr. Fraser opined that from a psychiatric perspective Mr. Small was not able to work at that time and would never be capable of returning to his past

work due to anxiety associated with scaffolding and heights.  On October 8, 2002, Dr. Fraser noted that Mr. Small was improving with no sign of a psychiatric impairment, but was "hurting a lot."  (Tr. 236).  He continued the Effexor and Ambien and recommended follow up for psychotherapy.

Dr. Turner continued to treat Mr. Small and on August 28, 2002, opined that he should continue to work with Dr. Miller until the questions regarding the seizures were adequately addressed.   In April 2003, a neuropsychological evaluation demonstrated a consistent pattern of responding to all test items.  The score on validity screening measures underscored Mr. Small's motivation to perform to the best of his abilities.  Dr. Turner's diagnoses again included cognitive disorder NOS, major depressive disorder, post-traumatic stress disorder and learning order NOS. The severity of the psychosocial stressors were considered to be moderate with a current global assessment of functioning (GAF) of 50.[1]  Dr. Turner noted that Mr. Small continued to exhibit deficits with attention and concentration specifically for tasks requiring sustained and focused attention, and was highly susceptible to interference and distraction.   These deficits would be likely to interfere with a number of cognitive processes including memory and learning abilities, and speed and information processing.   Dr. Turner opined that this was likely to have a significant impact on Mr. Small's ability to learn new information in the context of retraining for a new line of work and that these activities would require substantially more effort and the use of compensation strategies.  Mr. Small's problems were exacerbated by the presence of a pre-morbid borderline learning disability.  His overall general memory appeared to be mildly impaired with deficit instability to learn word list materials.  Some decay of visually learned information was also

---

[1]The GAF Scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. *See Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. rev. 2000) (*DSM-IV-TR*).  A GAF score of 41 to 50 suggests serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job). *Id.*

evident over time.  Dr. Turner was also concerned with Mr. Small's psychological functioning. He was experiencing a significant amount of psychological distress that appeared to have become progressively more severe since the last assessment when Mr. Small had appeared hopeful that he would regain most of his pre-fall functioning.  However, over time it became more evident that he would not return to his pre-morbid level of functioning and such realization left Mr. Small feeling hopeless and more depressed.  Dr. Turner believed that the symptoms of depression would have a negative impact on attention and concentration problems and overall cognitive efficiency, but that Mr. Small's neuropsychological condition was static in nature and did not present a progressive disease.  Based on the findings, Dr. Turner recommended that Mr. Small follow up with psychiatrist Dr. Conrad for treatment of the depression and that he continue in psychotherapy with Dr. Turner for cognitive compensation strategies and education regarding his brain injury.  (Tr. 243-53)

On October 18, 2003, Dr. Turner placed Mr. Small at MMI with a 35% impairment rating because over the preceding three to four months he had shown no significant improvement in either neuropsychological or emotional functioning and was not likely to experience further improvement. The neuropsychological impairment profile upon which Dr. Turner based the rating included slightly reduced intellectual abilities; moderate deficits specifically relating to higher brain function such as executive skills, planning, organizational abilities and memory functioning; slight perception deficits; and moderate problems with affect which continue to meet the criteria for major depression.  Mr. Small's concentration, persistence and pace with daily activities was moderately impaired and it was unlikely that he would be able to cope with the mental demands associated with working without further deterioration in his psychological and emotional functioning.  Dr. Turner also felt that Mr. Small's traumatic brain injury did meet the Social Security Disability guidelines for Organic Mental Disorder Section 12.02, Subsections A.2, A.4, A.5 and

B.1 through B.3.  Based on this level of impairment, Dr. Turner opined that it was unlikely that Mr. Small would be able to return to full-time employment, although at some point in the future, he may be able to work in an extremely structured setting on a part-time basis in the event that he showed any further improvement in both his symptoms of depression and mild cognitive impairment.  He believed that the Mr. Small would continue to benefit from supportive psychotherapy on an average of one time monthly during the next one to two years to provide support and ensure no further deterioration of his condition.  (Tr. 254-55).

In a sworn statement taken on March 6, 2006 (tr. 517-42), Dr. Turner testified that the testing done on Mr. Small was a valid indicator of his true functioning at the time of the test.  He felt that psychotherapy continued to be somewhat helpful with Mr. Small's depression as well as some basic compensatory strategies for memory. He did not find any indicators of malingering or fictitious behavior that would lead him to believe that Mr. Small was not being honest about the pain.  He tried to do some compensatory strategies for Mr. Small's memory but there was little progress, and Dr. Turner felt that the level of frustration he was experiencing prompted depression, and the pain precluded him from getting very far with those strategies. Dr. Turner stated that at a very basic level, most individuals who suffer from a mild traumatic brain injury experience something they call "sun-downing." Because of the chemical and organic changes that are taking place in the brain, they do not do well in the afternoon. It is called sun-downing as individuals like Mr. Small do not have the mental energy to continue tasks after 2 or 3 o'clock which results in poor performance and mistakes.  He also stated that Mr. Small had difficulty with attention, concentration and memory, and would have real difficulty in remembering the tasks he was to perform on new jobs and it would be very, very frustrating to try to train him. His final assessment was (1) frequent to constant estimated deficiencies of concentration persistence or pace resulting in the failure to complete

tasks in a timely manner in a work setting or otherwise and (2) marked limitations in terms of episodes of deterioration or compensation in the work like setting. Finally, Dr. Turner indicated that Mr. Small would have marked difficulty in understanding, carrying out and remembering instructions in a work setting.

On November 19, 2002, seven months after the accident, Mr. Small was seen by Michael P. Conrad, M.D., a psychiatrist. Dr. Conrad noted that Mr. Small had a sense that he was no longer the man he used to be and did not think he was going to be able to re-attain that. Dr. Conrad concluded that Mr. Small was suffering from post-traumatic stress disorder and possibly cognitive deficit secondary to brain injury, symptoms consistent with major depressive disorder causing moderate to severe limitations with the loss of the ability to work and a GAF of 50 to 55.[2] Dr. Conrad recommended Mr. Small continue to take Effexor for his depression and anxiety, and Klonopin to treat the PTSD, difficulty sleeping and for daytime anxiety. He scheduled a follow up appointment to consider cognitive enhancers such as Provigil and wanted to have him retested by Dr. Turner sometime in January or February. He also stated that attendant care for 12 hours per day was appropriate until Mr. Small had an epilepsy monitoring unit (EMU) study. (Tr. 273-76).

Mr. Small returned to Dr. Conrad on December 12, 2002, reporting that things had been going pretty well (tr. 272). He did not think that he had been sleeping as well with the Klonapin as compared to the Ambien and Dr. Conrad increased the medication. Dr. Conrad restated his diagnosis of PTSD and cognitive deficit. He continued to treat Mr. Small until on or about June 21, 2004. (Tr. 262–71, 444). He was started on a medication to improve his cognition and attention abilities and switched back to Ambien for sleep. He still reported having nightmares at times and some anxiety during the day whenever he saw scaffolding. He was still not

---

[2]A GAF of 51 to 60 suggests moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). See *DSM-IV-TR* at 34.

functioning as well cognitively as he would have liked, and he was having a difficult time with his memory.  In February of 2003, Dr. Conrad felt that Mr. Small no longer needed attendant care from a psychiatric standpoint.  He did feel, however, that they needed to do whatever it took for Mr. Small to get back into the workforce, although Dr. Conrad thought it would be extremely difficult due to Mr. Small's previous education level and his current memory issues.  Dr. Conrad prescribed Ritalin which Mr. Small said tired him, so that medication was discontinued and replaced with Provigil.  Mr. Small reported that he still did not leave home very often, but  thought the Effexor seemed to be helping his depression somewhat.

In June 2003, Mr. Small reported to Dr. Conrad that things were still not going very well for him.  None of the treatments seemed to make much difference and Mr. Small was still feeling irritable and out of control at times with his children.  He was also not sleeping well at night.  For these reasons and because Dr. Turner had not seen any improvement in the depression, Dr. Conrad tried a different approach and started Mr. Small on Remeron at nighttime and Gabatril in hopes that it would help with the anxiety and irritability.  In July of 2003, Mr. Small reported that things really were not any better for him.  He still felt irritable with his family although perhaps a little less so.  He had noticed effects from the Gabatril but some sleepiness from the Remeron.  Unfortunately the sleepiness did not translate into him sleeping better, so Dr. Conrad increased the Remeron at nighttime and re-prescribed the Ambien on an as-needed basis.  He also prescribed Straterra to take during the morning to see if it would help Mr. Small with concentration and focus.

In September, Mr. Small reported that the Straterra did not seem to make any difference in his ability to focus or concentrate.  Virtually none of the standard treatments including stimulants seemed very helpful with improving his cognition.  His irritability had decreased to some degree and retesting showed the deficits were static with some improvement and some worsening.  In January 2004, Mr. Small

reported to Dr. Conrad that everything was going reasonably well.  He was having a lot of pain and was being evaluated by a pain management specialist.  Dr. Conrad continued his medications and asked him to return in three months (tr. 262).  Mr. Small last saw Dr. Conrad on June 21, 2004.  He continued to function pretty well with less depression and some less irritability.  He reported that Xanax had been helpful, although it made him tired.  He only took it on days that he felt he became very angry and irritable towards his family.  Dr. Conrad's assessment at that time was organic affective disorder secondary to brain injury and chronic pain (tr. 444).

On October 20, 2004, Mr. Small was referred to Kent Rowland, Ph.D., psychologist, by the Office of Disability Determinations for a clinical evaluation.  Dr. Rowland concluded that Mr. Small suffered mood disorder due to head trauma; major depressive disorder, single episode of moderate severity; a reading disorder and a disorder of written expression.  He gave a provisional GAF of 45 and wanted to rule out dementia and amnesia due to head trauma.  He noted that Mr. Small's recent recall was very weak and that he was unable to identify either the examiner's names or his introductory remarks after a 30 minute delay.   Affect was restricted and Mr. Small appeared to be dysphoric.  Dr. Rowland felt that he was severely impaired cognitively and emotionally (tr. 325-29).

On May 31, 2007, Peter Oas, Ph.D., a psychologist, conducted a psychological evaluation at the request of the Office of Disability Determinations. Mr. Small was oriented, his sustained attention and concentration were adequate, his memory was good, as was articulation.  He was logical, goal-directed and was a good historian. IQ scores on the WAIS-III were all above 90.  Insight and judgment were grossly unimpaired.  He felt that Mr. Small had mild and intermittent depression and some slight memory impairments, but nothing that would prevent him from successfully functioning in a variety of jobs.  He considered the diagnoses of depression NOS specified and pain disorder associated with psychological factors. He believed that

Mr. Small's cognitive status and abilities had significantly improved from when it was evaluated 3 to 4 years prior, although he did note some slight memory impairment (tr. 561-68).

## HEARING TESTIMONY

Mr. Small testified at both hearings.  At the November 17, 2005 hearing he testified that he continued to have pain in his arm, shoulder, neck and back which was of an aching and throbbing nature.  The pain prevented him from sitting for long periods of time.  He also described a "pins and needles" sensation and numbness in his left hand.   He was taking Lortab and Methadone for his pain which caused side effects including drowsiness, dizziness, lightheadedness and occasional nausea.  He described problems with concentration, focus and confusion.  He was able to sit for 10 to 15 minutes after which he would begin hurting and needed to stand up and move around, and could walk for 20 to 30 minutes after which he would suffer dizziness and other symptoms.  He stated that the most he was able to do with his left arm was to go through the mail, but was unable to use it for much else.  He had difficulty sleeping and was tired much of the day.  He usually napped during the afternoon.  He tried to help his wife around the house by restocking the toilet paper, picking up laundry and starting the washing machine, but he had difficulty with vacuuming, unloading the washing machine and washing dishes (tr. 604-59).

At the September 11, 2007 supplemental hearing, Mr. Small testified that his pain was worse and that his doctor had increased his dose of Methadone.  The pain in his left arm now traveled into his left shoulder and into his back.  He was still unable to straighten his right arm fully and suffered aches and sharp pain in the right elbow.  While the medications he was taking for the RSD caused numerous side effects, it was necessary to relieve the pain to some degree.  He rarely drove

because of the medication side effects and his difficulty concentrating.  His memory problems and forgetfulness persisted.  While he was able to pick up a gallon of milk, he had difficulty pouring it.  He continued to have difficulty sleeping due to pain and was often up and down all night, averaging only 2 to 3 hours of sleep per night.  He could make small meals, but could not do such tasks as carving turkey or ham or turning a door knob.  He was irritable because of his chronic pain.  His left wrist and hand continued to swell.  He had headaches nearly every day.  His doctor indicated that the headaches may be due to stress or a side effect of the medication. He often needed to lie down and rest due to their severity (tr. 662-81).

Mr. Small's wife testified that since the accident Mr. Small had been very forgetful and that she often had to call him to remind him of doctor's appointments or make lists for him of things that he was supposed to do.  However, there were times when he could not even remember to look at the list that his wife had made.  Mrs. Small also noticed that her husband had difficulty focusing which caused him to become frustrated and angry.  Before the accident he had been very good at doing math in his head and was able to pay bills.  Since the accident he could not do either without assistance.  Mrs. Small stated that her husband was often in so much pain that he rocked back and forth as if he were agitated.  She was worried about her husband because he had stated that he wished that he would "roll over and die."  Mrs. Small testified that her husband often stated that he was tired of the pain and could not stand it anymore.  He had difficulty sleeping and would wake up screaming (tr. 682-99).

## DISCUSSION

Mr. Small argues that the ALJ erred in failing to give appropriate weight to the opinions of the treating physicians, in improperly discounting his subjective complaints of pain, and in not accepting the opinion of the vocational expert, and

that he was disabled from his onset date as a matter of law.  The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.  The issue thus presented is whether the ALJ's decision that the Mr. Small was not disabled, in light of his physical and mental condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

The first two issues - the physicians' opinions and Mr. Small's subjective complaints of pain, are very much intertwined, and will be addressed together.

1.    <u>Opinions of treating physicians and subjective complaints of pain.</u>

As shown above, Mr. Small fell from a scaffold and suffered orthopedic injuries.  His initial surgeries were successful, but he ultimately claimed to have developed extremely painful RSD in his left arm which Dr. Kunis described as intractable and virtually incapacitating.  As this court is well aware, pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.   The Eleventh Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[3] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

---

[3]*Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Ogranaja v. Commissioner of Social Security*, 186 Fed.Appx. 848, 2006 WL 1526062, *3+ (11th Cir. 2006) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson, supra*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has held that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1259 (M.D.Fla. 2005). However, the presence or absence of evidence to support symptoms of the severity claimed is a factor that can be considered. *Marbury*, 957 at 839-840; *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit subjective testimony of the plaintiff concerning pain he must do so explicitly and give reasons for that decision. *MacGregor v. Bowen*, 786 F.2d at 1054. Where he fails to do so, the Eleventh Circuit has stated that it would hold as a matter of law that the testimony is accepted as true. *Holt v. Sullivan*, 921 F.2d at 1223; *MacGregor v. Bowen*, 786 F.2d at 1054. Although the Eleventh Circuit does not require an explicit finding as to a claimant's

credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted). And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-1226; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F.Supp.2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints. Those complaints are, after all, subjective. "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[4] People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." *Hand, supra,* at 1548-49. It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of

---

[4] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

*Case No: 3:08cv44/MCR/MD*

other evidence." *Arnold v. Heckler*, 732 F.2d 881, 884 (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.   The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

In making his residual functional capacity determination, the ALJ first performed a credibility determination (tr. 35-43).  Mr. Small alleged that he could not work due to disabling pain, headaches, dizziness, tremors, difficulty concentrating, and depression (tr. 38, 108, 610-15).   However, the ALJ found that his reported activities of daily living were inconsistent with these allegations (tr. 41-42).  He noted that Mr. Small testified at the hearing that his activities included helping with light household chores, preparing simple meals, driving, and going for walks (tr. 41, 616). He also noted that Mr. Small had reported to others that he went hunting with his brothers and went fishing with his children (tr. 41, 220, 262, 563).   The ALJ considered Mr. Small's report to Dr. Rowland that he was capable of driving, had a "little difficulty" with bathing but was able to dress himself, fix meals, make beds, and wash dishes (tr. 27, 327).   He reported that he went shopping with his wife, visited with family and friends, attended church, went for walks, watched television, went for rides with his family, and went to yard sales (tr. 27, 327).  Mr. Small told Dr. Oas that his typical daily activities included working in the yard, doing "various things around the house," going to the store, fishing with his children, and trying to stay busy (tr. 30, 563).   The ALJ found that these activities were inconsistent with allegations of disabling pain and limitation to the extent claimed by Mr. Small and Dr. Kunis (tr. 41-42).   The ALJ did consider that Mr. Small reported other activities which would be considered fairly limited, but overall found that Mr. Small's reported activities detracted from the credibility of his subjective complaints (tr. 41).  The ALJ

may consider such daily activities when evaluating subjective complaints of disabling pain and other symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(l) (2008).  *See also Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996); *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987).

The ALJ also noted evidence that Mr. Small did not put forth maximal effort towards his recovery, and that he did not fully cooperate with his medical treatment (tr. 42).  For example, on October 4, 2002, Dr. Miller reported that he was concerned about the "focus on his disability impairment, rather than on job retraining and recovery" (tr. 42, 419).  Dr. Miller stated that Mr. Small was not having generalized convulsions and that he was concerned that the 24-hour attendant care Mr. Small was receiving was fostering dependency and compromising Mr. Small's confidence in getting back into activities which he would safely be able to undertake (tr. 42, 419).  Noncompliance with treatment is a proper factor in the credibility analysis.  *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[T]he ALJ's consideration of Ellison's noncompliance as a factor in discrediting Ellison's allegations of disability is adequately supported . . . .").  The ALJ also noted that on December 11, 2003, Mr. Small called Dr. Rogers to request pain medication (tr. 42, 256).  However, when Dr. Rogers stated he would only prescribe Darvocet, Mr. Small said he would find another doctor and hung up (tr. 42, 256).  The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.  See *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

Mr. Small testified that his medications, Lortab and Methadone, made him feel dizzy, lightheaded, tired, and sometimes nauseous (tr. 611, 615).  However, the ALJ found that these allegations were not corroborated by the medical evidence of record (tr. 42).  As stated above, the ALJ may properly discount Mr. Small's credibility because of inconsistencies in the record as a whole.  *Moore*, 405 F.3d at 1212.

The ALJ noted Dr. Turner's opinion that it was unlikely Mr. Small would ever be able to return to full-time employment, but found that this opinion was conclusory and was an issue reserved to the Commissioner, and so did not give it controlling weight (tr. 42, 255, 541).  20 C.F.R. §404.1527(e); SSR 96-5p.  The ALJ then discussed the weight Dr. Turner's opinions merited, but found they were entitled to little weight as they were not supported by his own testing nor by the findings of the other treating and examining mental health specialists (tr. 42).  The ALJ may properly discredit the opinion of a treating doctor when the opinion is not supported by the evidence of record.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (good cause to discredit a treating doctor's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary findings; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.").

The ALJ first questioned whether Dr. Turner ever functioned in the role of treating source for Mr. Small (tr. 32).  Dr. Turner's primary role was to perform neuropsychological tests for Mr. Small's workers compensation case, and he referred Mr. Small to others for actual treatment (tr. 32, 206-18, 243-55, 416-17, 514-44).  Regardless, the ALJ found that Dr. Turner's opinions were not supported by the evidence of record (tr. 32, 42).  The ALJ specifically noted that Mr. Small's intelligence test scores were in the "average" range, and that his cognitive deficits and overall general memory deficits were characterized as "mild" (tr. 32, 42, 209-17, 243-51).  Additionally, Dr. Fraser, to whom Dr. Turner referred Mr. Small for psychiatric treatment, opined in August 2002 that within two to four months Mr. Small would be capable from a psychiatric perspective of working at other occupations so long as he avoided work involving work around scaffolding and heights (tr. 33, 223).  In September 2002, Dr. Fraser found Mr. Small was at maximum medical improvement and assigned a zero percent impairment rating (tr. 33, 237).

He opined that Mr. Small had no psychiatric work restrictions aside from no work at heights or with scaffolding (tr. 33, 223).  Again in October 2002, Dr. Fraser found no signs of psychiatric impairment (tr. 33, 236).  The ALJ further found that Dr. Turner's opinions were not supported by the findings of Dr. Conrad, Dr. Rowland, or Dr. Oas, (tr. 33).  Dr. Conrad, a treating psychiatrist, initially found that Mr. Small displayed post traumatic stress disorder symptoms consistent with a single episode of major depressive disorder, and the "possibility" of cognitive deficits (tr. 33, 276).  He then made medication adjustments, and in December 2002 and January 2003, Mr. Small mentioned that he wanted to try driving commercial equipment and that he had been "trying to stay busy around the house."  (Tr. 33, 271-72).  By February 2003, Mr. Small was doing "pretty well" with his anxieties and was "functioning pretty well at home." (Tr. 33, 270).  In September 2003, Dr. Conrad noted that Mr. Small had been released to return to medium level work from workers compensation (tr. 33, 264).

In January 2004, Mr. Small told Dr. Conrad that everything was going "reasonably well," and that he had been able to "enjoy time hunting."  (Tr. 33, 262).  In June 2004, Dr. Conrad noted that Mr. Small continued to function "pretty well" and that the medications prescribed had "worked well."  (Tr. 444).   The ALJ noted that Dr. Rowland, a consultative examiner who evaluated Mr. Small on October 20, 2004, stated that he had "no data on which to validate the claimant's alleged cognitive loss." (Tr. 33, 329).  Dr. Rowland recommended intelligence testing and abbreviated neuropsychological screening (tr. 33, 329).

Finally, the ALJ noted that Dr. Oas, who performed a consultative examination in May 2007, opined that Mr. Small's cognitive status and abilities "at this time is significantly improved from when he was evaluated three to four years ago."  (Tr. 33, 567).  He opined that Mr. Small still had some "slight" memory impairment, but that it was not so significant that it would preclude his ability to function in a variety of jobs (tr. 567).  Dr. Oas performed a thorough examination, including intelligence

testing, and found "no other significant neuropsychological or cognitive deficits" that would prevent him from working at a "number of occupations." (Tr. 567). Dr. Oas further opined that Mr. Small was experiencing only "relatively mild and intermittent" depressive symptoms (tr. 567).  Dr. Oas completed a Medical Source Statement and opined that Mr. Small would have only "mild" limitations in his ability to: understand, remember, and carry out simple instructions; make judgments on simple work-related decisions; carry out complex instructions; make judgments on complex work-related decisions; and interact with the public, supervisors, and co-workers (tr. 33, 569-70).   Dr. Oas opined that Mr. Small would have moderate limitations only in his ability to understand and remember complex instructions, and to respond appropriately to usual work situations and changes in a routine work setting (tr. 33, 569-70).  The ALJ gave appropriate reasons for giving little weight to Dr. Turner's opinions.

After considering the evidence and finding Mr. Small's subjective complaints were not fully credible, the ALJ proceeded to the residual functional capacity determination.  Residual functional capacity is the most an individual can do despite his limitations based upon all the evidence of record.  *See* 20 C.F.R.§ 404.1545; SSR 96-8p.  Mr. Small argues that in making the residual functional capacity determination, the ALJ should have accorded controlling weight to Dr. Turner's opinions.  However, as discussed above the ALJ properly discredited Dr.  Turner's opinions.

Mr. Small also argues that the ALJ should have given controlling weight to the opinion of Dr. Kunis that Mr. Small's pain was "intractable and virtually incapacitating." The ALJ considered this opinion as well, but found that it was not supported by the evidence of record (tr. 35).  As stated above, the ALJ may discredit the opinion of a treating doctor when the opinion is not supported by the evidence of record.  *See Phillips*, 357 F.3d at 1240-41 (good cause to discredit a treating

doctor's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary findings; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). The ALJ found that Dr. Kunis' course of treatment was not consistent with the extremity of his opinion that Mr. Small experienced "intractable and virtually incapacitating" pain (tr. 35). The ALJ noted that it was unclear whether Dr. Kunis had the benefit of reviewing the reports from other medical sources, because his opinion was not supported by the other sources (tr. 35). For example, Mr. Small reported to Dr. Timmons in October 2002 that his left upper extremity pain "had pretty much resolved." (Tr. 35, 479). Dr. Timmons opined that his left upper extremity was at maximal medical improvement, and opined that Mr. Small had only a five percent impairment rating (Tr. 479).

The ALJ also noted that Dr. Cameron, an orthopedic specialist who performed an independent evaluation, opined that Mr. Small was capable of performing "medium duty work," the only exception being no work at heights (tr. 238-40). Dr. Cameron assessed a five percent impairment of Mr. Small's left upper extremity and a two percent impairment of his right upper extremity (tr. 239).

The ALJ noted that Mr. Small was treated by Dr. Tappan from April 2002 through April 2003 (tr. 35, 277-84). Dr. Tappan placed Mr. Small at maximum medical improvement in October 2002, and opined that he had a six percent total body impairment from his upper extremity impairments (tr. 277). Dr. Rogers, who treated Mr. Small from June 2002, through December 2003, opined that Mr. Small had permanent restrictions of no lifting in excess of 20 pounds and avoiding repetitive motion (tr. 36, 256). Finally, the ALJ noted that Dr. Koulisis, a consulting orthopedist, examined Mr. Small in June 2007 and opined that he could perform a range of light work activity (tr. 36, 554-59). Accordingly, the ALJ properly considered Dr. Kunis' opinion and found that it was not supported by substantial evidence.

Viewing the evidence as a whole, it is evident that of all the many treating and examining physicians involved in this matter, only Dr. Turner and Dr. Kunis felt that Mr. Small's limitations were so severe as to be disabling from all gainful employment.  The ALJ's finding that Mr. Small's restrictions and limitations were not as severe as claimed was supported by substantial record evidence.  Because the ALJ articulated the inconsistencies upon which he relied in discrediting Mr. Small's testimony regarding his subjective complaints of disabling impairments, and because the ALJ's credibility finding is supported by substantial evidence on the record as a whole, his credibility finding should be affirmed.

2.      Hypothetical question and testimony of the vocational expert.

For his second ground for reversal Mr. Small contends that the ALJ erred in not accepting the vocational expert's testimony that he could not work given certain parameters.  A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence.   *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985).  However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1161 (11th Cir. 2004). Here, the ALJ did not find Mr. Small's subjective complaints fully credible.  The ALJ also properly discredited the medical opinions of Dr. Turner and Dr. Kunis. Therefore, the hypothetical question posed by the ALJ to the vocational expert properly included only those impairments and restrictions that the ALJ found to be credible.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be AFFIRMED, that this action be DISMISSED and that the clerk be directed to close the file.

**At Pensacola, Florida this 30th day of January, 2009.**

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**